United States District Court
Middle District of North Carolina

| | |
|---|---|
| William Graham, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Procter & Gamble Health & Long-Term Disability Plan, | ) |
| | ) |
| Defendant | ) |

## Complaint

Plaintiff William Graham files this complaint against defendant Procter & Gamble Health & Long-Term Disability Plan ("LTD Plan").

## Nature of Controversy

1. Mr. Graham claims he is entitled to recover long-term disability benefits from LTD Plan pursuant to 29 U.S.C. § 1132(a)(1)(B) of ERISA. The relief Mr. Graham seeks from LTD Plan is (1) long-term disability benefits from May 29, 2019, to the date of judgment, with prejudgment interest, (2) a determination that he is entitled to be paid monthly long-term disability prospectively for as long as he remains qualified for such benefits under the terms of LTD Plan's plan documents, and (3) an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

## Parties and Jurisdiction

2 Plaintiff William Graham is a citizen and resident of Alamance County, North Carolina.

3 Defendant LTD Plan is an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1).

4. The Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 1132(e)(1). Venue is proper in this district pursuant to 29 U.S. C. § 1132(e)(2) because Mr. Graham resides in this district and acts and occurrences that gave rise to Mr. Graham's claim occurred in this district.

## Additional Facts

5. The Procter & Gamble U.S. Benefits Plan Summary Plan Description ("SPD") is the plan document that describes Procter & Gamble's short-term and long-term disability benefits. The SPD defines "Disability" to mean either "Partial Disability" or "Total Disability." "Partial Disability" is defined as follows:

> "Partial Disability" as (sic) a mental or physical condition resulting from an illness or injury because of which the participant is receiving medical treatment and cannot perform the regular duties of his or her current job, but can perform other useful roles at the same Company site or at other jobs outside the Company. Thus, a partially disabled participant is not necessarily prevented from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home.

"Total Disability" has the following meaning under the LTD Plan SPD:

> Total Disability" means a mental or physical condition resulting from an illness or injury that is generally considered totally disabling by the medical profession and for which the participant is receiving regular recognized treatment by a qualified medical professional. Usually, total disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home.

6. The SPD provides that short-term disability benefits are payable for up to 52 weeks to an employee who is "Disabled." An employee who has received 52 weeks of disability income benefits under the short-term disability plan may then begin receiving long-term disability benefits. The duration of long-term disability benefits depends on whether the employee is considered to have a "Partial Disability" or a "Total Disability." A claimant who is partially disabled may receive long-term disability benefits for a maximum of 52 weeks during his lifetime. On the other hand, if a claimant is totally disabled, the claimant may receive benefits until the later of age 65 or the date the claimant has received five continuous years of disability benefits under the plan.

7. Mr. Graham worked for The Procter & Gamble Company ("Procter & Gamble") at its Browns Summit, North Carolina manufacturing facility during two periods—from March 14, 1988 through January 31, 2003 and from November 17, 2015 through May 16, 2017.

8. On February 1, 2003, Mr. Graham went out of work on disability leave due to osteoarthritis and bilateral knee pain, lower back pain with L5 to S1 radiculopathy caused by degenerative disc disease and recurrent disc herniations, and cervical spine pain. He was paid short-term disability benefits for one year and then received long-term disability benefits from LTD Plan until he returned to work on November 17, 2015. During most of that time, from June 22, 2005 through November 16, 2015, LTD Plan approved Mr. Graham based on multiple determinations that he was "Totally Disabled" as defined in LTD Plan's plan documents.

9. By a letter dated September 27, 2003, the Social Security Administration notified Mr. Graham that his application for Social Security disability income benefits had been approved. The Social Security Administration found that Mr. Graham was disabled retroactive to his last day of work, February 1, 2003. Mr. Graham received Social Security disability benefits from July 2003 until he returned to work for Procter & Gamble in 2015. The Social Security Administration reinstated Mr. Graham's disability income benefits after Mr. Graham discontinued working in May 2017.

10. In November 2015, Mr. Graham wrote to Procter & Gamble and advised that he had undergone a number of operations to correct his orthopedic problems and that his primary care provider agreed that he could return to work.

11. Mr. Graham returned to work at Procter & Gamble's Browns Summit plant on November 17, 2015 and worked there through May 16, 2017.

12. During the time Mr. Graham was reemployed, he experienced increased pain in his right knee, lumbar spine, and neck. After Mr. Graham discontinued working, he underwent a lumbar spine fusion at L3 to L4 on June 21, 2017 and a right knee replacement on November 6, 2017. The lumbar fusion was performed above a previous fusion of L4 to S1 fusion that had been performed in 2003. As part of the 2017 procedure, the surgeon removed the hardware that had been installed at L4 to S1 during the 2003 operation.

13. Mr. Graham began receiving short-term disability benefits from Procter & Gamble on May 17, 2017, on the basis that he was totally disabled. One year later, Mr.

Graham began receiving long-term disability benefits based on a determination that he remained totally disabled.

14. Mr. Graham's claims for disability benefits were supported by Dr. Gary Cram, the neurosurgeon who performed his June 2017 fusion surgery, and by Dr. James Hooten, the orthopedic surgeon who performed his November 2017 right knee replacement. Dr. Cram stated on numerous occasions that Mr. Graham remained "permanently and totally disabled" and unable to work.

15. LTD Plan hired Genex Services to evaluate Mr. Graham's claims for benefits. Genex Services made numerous determinations that Mr. Graham was totally disabled. Reports dated June 20, 2017, July 11, 2017, August 15, 2017, September 5, 2017, September 19, 2017, October 6, 2017, October 10, 2017, November 22, 2017, December 3, 2017, January 16, 2018, March 1, 2018, March 30, 2018, April 11, 2018, May 24, 2018, June 18, 2018, July 17, 2018, and August 20, 2018 all indicate that Mr. Graham qualified for short-term disability or long-term disability on the basis that he was totally disabled.

16. On September 28, 2018, Genex Services informed Mr. Graham that it planned to schedule Mr. Graham for a functional capacity evaluation ("FCE") and an independent medical examination ("IME"). Mr. Graham advised the Genex representative that he had a new onset of right arm shaking and was waiting to have a brain MRI scheduled.

17. On October 16, 2018, Mr. Graham advised Genex that the brain MRI showed he had Parkinson's Disease and that he had been prescribed medication.

18. Genex scheduled Mr. Graham for an FCE on November 11, 2018, and an IME on November 16, 2018. Those evaluations were postponed at the recommendation of Dr. Jeffrey Sparks, Mr. Graham's primary care physician, due to Mr. Graham's elevated blood pressure. Mr. Graham was medically cleared to undergo an FCE on December 9, 2018.

19. LTD Plan scheduled Mr. Graham for an FCE with Kimberly Bass, PT of Select Physical Therapy and for an IME by Dr. Alvin Antony of Carolina Sports and Spine.

20. Mr. Graham underwent the FCE on December 12, 2018. Ms. Bass' report states that Mr. Graham had a "physical demand level" of "sedentary." Her report states that the term "sedentary" is defined to mean:

> Exerting up to 10 lbs. of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time to lift, carry, push, pull or otherwise move objects, including human body.

Under the heading "Summary," Ms. Bass wrote:

> Mr. Graham demonstrated the ability to occasionally lift up to 20 lbs. floor to waist, 25 lbs. waist to shoulder, carry up to 20 lbs., push 31 lbs. of force, and pull 31 lbs. of force. His (sic) demonstrated occasional standing, walking, stair climbing. He also displayed frequent reaching at desk level, reach floor level, balancing, stooping, object handling, fingering, simple hand grasp, firm hand grasp, and fine/gross hand manipulation. In addition, Mr. Graham demonstrated constant sitting. Lastly, he was unable (sic) kneeling, crouching, and crawling. Anaerobic capacity test was not conducted.
>
> Deficits identified during testing include decreased lumbar and cervical range of motion.

> Mr. Graham demonstrated consistent performance throughout testing. This, in combination with physiological responses (heart rate and respiratory rate), movement and muscle recruitment patterns both aware and unaware of observation, indicates that the results of this evaluation can be considered to be an accurate representation of his functional abilities.

Ms. Bass' overall conclusion that Mr. Graham had a "sedentary" physical demand level are contradicted by numerous findings and observations reported in her report.

21. Ms. Bass concluded that Mr. Graham's sitting tolerance was "constant." However, the entire FCE lasted only two hours and forty-six minutes, during which time Ms. Bass had Mr. Graham perform several physical function tests. The report does not disclose how long Ms. Bass observed Mr. Graham sitting. The report notes that Mr. Graham stated that his sitting tolerance was only 20 minutes. The report contains a note under the heading "Positional Tolerance" that indicates Mr. Graham had an elevated pain level in his low back while sitting. Thus, Ms. Bass' conclusion that Ms. Graham "demonstrated constant sitting" is not supported by her test results and observations. Moreover, there is nothing in the report that supports that Mr. Graham had the ability to perform a full-time occupation that involves continual sitting.

22. Ms. Bass found that Mr. Graham had the ability to stand and walk on an occasional basis, which is defined to mean "up to one-third of the time." This finding is meaningless, as the report defines "occasional" to mean from 0.0% to 33 1/3% of the time. Ms. Bass's findings indicate that Mr. Graham's ability to stand and walk were significantly limited. Ms. Bass noted that Mr. Graham "walked in the gym for 4 minutes before requesting to stop and sit secondary to fatigue" and walked with a "slow, antalgic

gait with a widened stance." Under the heading "Positional Tolerance," next to "Standing," Ms. Bass wrote "Positional Change Observed. Mr. Graham needed to sit and rest secondary to fatigue. He stood for 12 minutes maximum before needing to rest." Next to "Walking," Ms. Bass wrote "Unable to tolerate task. Able to walk for 4 minutes."

23. Mr. Graham's ability to perform material handling tests was also extremely limited. In the report of Mr. Graham's performance on the "Waist to Shoulder Dynamic Life Test," Ms. Bass wrote "Mr. Graham struggled to put the box on the shelf at 25 lbs. and complained of pain in his upper back area. Frequent lifting was not tested secondary to his inability to stand frequently." During the "Floor to Waist Dynamic Lift Test," Mr. Graham "did a partial squat" and Ms. Bass discontinued the test, noting "Frequent Lifting was not tested secondary to his inability to stand frequently." Likewise, Mr. Graham showed "signs of fatigue" during the "Floor to Shoulder Dynamic Lift Test" and frequent lifting was not tested due to Mr. Graham's inability to stand frequently. During the "Carry Testing," Mr. Graham "walked very slowly" and "complained of significant fatigue and shakiness." He "reported pain in his upper back with the Push/Pull Test." Ms. Bass wrote that "A tremor was observed in his right hand throught (sic) Material Handing testing."

24. In a total of nine instances, Ms. Bass found that Mr. Graham had "frequent" or "occasional" functional ability, even though her comments state that Mr. Graham complained of pain, that his ability to perform the test was limited, or that Ms. Bass terminated the test. Consistent with Mr. Graham's complaints of significant back pain, Mr. Graham's range of motion in his spine was significantly limited. Although Ms. Bass

found that Mr. Graham had "frequent" manipulative abilities in all areas – object handling, fingering, simple hand grasp, firm hand grasp, and fine/gross manipulation – there is no indication what testing was performed. Finger strength was not tested.

25. Thus, it is clear from Ms. Bass's FCE report that Mr. Graham experienced significant pain during almost every test she asked him to perform. Mr. Graham reported to Ms. Bass that he had been diagnosed with Parkinson's Disease about two months before and that he suffered extreme pain in his low back and weakness in his legs. Mr. Graham reported that he had fallen at times. He reported that walking aggravated his symptoms and sitting in a recliner or lying down provided relief. Mr. Graham reported that his pain level during the testing was a five on a ten-point scale. He told Ms. Bass that he was independent with his activities of daily living and that his typical day included making his bed, fixing breakfast, watching TV, washing dishes, walking around his yard, eating lunch, travel to see his grandkids, eating supper, watching TV, and reading. Ms. Bass found that Mr. Graham had "tenderness to palpation in upper trapezius and rhomboid."

26. On January 4, 2019, at the direction of LTD Plan, Mr. Graham underwent a medical evaluation by Dr. Alvin Antony. Dr. Antony is board certified in physical medicine and rehabilitation and in pain management. Dr. Antony noted in his physical examination that Mr. Graham had "pain on palpation of his lumbar spine around the low back region and around the surgical scar." Commenting on Mr. Graham's sitting tolerance, Dr. Antony wrote:

Sitting Tolerance: He was able to sit in the waiting room for about 30 minutes. He does not list when seated or standing.

********

Some pain noted when transitioning from seated to standing.

Regarding Mr. Graham's ability to walk and stand, Dr. Antony noted:

He was able to stand and walk in and out of the exam room without assistance of a cane.

********

Gait: mildly antalgic gait; He uses NO cane to walk.

27. In response to the question whether Mr. Graham was "Totally Disabled," Dr. Antony responded in the negative. However, in his explanation, Dr. Antony misstated the definition of disability. He wrote

The employee is NOT totally disabled. Total Disability is reserved for individuals who are incapable of self-care or totally house/bed restricted.

Dr. Antony added:

The employee does not use an assistive device, drove to the office today independently from Burlington, NC approximately 1 hr away. He is independent with his ADLs and completed a functional capacity evaluation which demonstrates a sedentary level of work ability. The employee has mild parkinson's disease at this time and is independent in his self-care, mobility, and he currently drives independently.

28. Dr. Antony also found that Mr. Graham, although not totally disabled, was "partially disabled and only capable of sedentary work" due to his diagnosis of "chronic pain from lumbar fusion surgery and cervical fusion surgery." In response to a request that Dr. Antony provide the basis for his conclusion and the specific data from his examination and file review that supported his conclusion, Dr. Antony indicated that he

relied on the Ms. Bass' statement in her FCE report that Mr. Graham had a "sedentary" work capacity. He wrote:

> The employee is currently at a partial disabled status. A status of partially disabled is based on a file review of the medical records, today's physical examination, interview with the claimant and a functional capacity evaluation which notes the following relevant findings. The claimant ambulates without an assistive device as noted by the claimant and noted in the physical examination. The functional capacity evaluation (FCE) which was completed on 12/12/2018 notes that the claimant can sit, stand, walk, lift, climb stairs, balance, reach but some of these are limited due to tolerance issues. The FCE noted that the claimant was unable to kneel, crouch or crawl because of pain issues related to previous back and knee surgeries. The claimant is independent with ADLs and drives independently as reported from the history and physical examination. A determination of partial disability is based on the above findings and medical evidence. The claimant does not meet criteria for total disability given the findings above.

Dr. Antony did not discuss any of the findings from Ms. Bass's FCE report that indicated that Mr. Graham may not be able to work.

29. Dr. Antony was asked whether Mr. Graham had work restrictions that would facilitate a return to work in any occupation. Dr. Antony wrote the following in his response:

> The employee is currently in a sedentary level of work ability. The employee would be able to work approximately 4hrs/workday. The claimant can sit for 4 hrs per day with stretch breaks every 30mins. Standing should be limited to less than 15min per workday. Walking should be limited to less than 15 mins per workday. The claimant would be able to lift 10lbs frequently, 5lbs carry, 100lbs push and pull. The employee can reach (non-load bearing) at shoulder level and at desk level constantly. The employee can only reach above shoulder level occasionally. He can fully handle, finger and feel constantly with both hands. The above restrictions are permanent and not expected to improve.

30. Dr. Antony's report was provided to LTD Plan on January 11, 2019. On February 21, 2019, LTD Plan advised Mr. Graham that its Corporate Review Board

determined that as of January 28, 2019, he was no longer considered "totally disabled" but would continue to receive benefits for "partial disability" for the remainder of LTD Plan's 52-week lifetime benefit period. The letter further advised Mr. Graham that he had previously received partial disability benefits from October 25, 2004 through June 21, 2005, a total of 34 weeks and two days of partial disability benefits and, therefore, a total of 17 weeks and 3 days remained of Mr. Graham's lifetime maximum of 52 weeks of partial disability benefits. The letter stated that Mr. Graham had the right to appeal LTD Plan's decision by submitting an appeal within 180 days to the Disability Committee.

31. On May 20, 2019, Mr. Graham appealed LTD Plan's decision. Mr. Graham's appeal consisted of a letter he wrote and medical reports from his providers.

32. LTD Plan informed Mr. Graham by a letter dated July 26, 2019 that its Disability Committee had denied his appeal. The letter advised that based on a review of the medical records, the FCE, and the independent medical examinations, the Disability Committee determined Mr. Graham's condition did not meet the requirement of "Total Disability" requiring hospitalization or home confinement from May 29, 2019 forward. The letter further advised that the Disability Committee had determined that the decision that Mr. Graham met the definition of "Partial Disability" and that since 52 weeks of long-term disability benefits had already been paid no further benefits were payable. The letter advised that Mr. Graham had exhausted his disability benefits under the LTD Plan plan documents and that if he remained dissatisfied with the result of his appeal he had the right to bring a civil action under section 502(a) of ERISA.

Claim for Relief
(29 U.S.C. § 1132(a)(1)(B) and (g))

33. The other allegations of this complaint are incorporated by reference.

34. LTD Plan is an employee welfare benefit plan within the meaning of ERISA. Mr. Graham is covered under the LTD Plan plan documents.

35. LTD Plan violated 29 U.S.C. §1133 by failing to provide Mr. Graham a full and fair review of his claim for continued long-term benefits and wrongfully denied his claim for such benefits.

36. Mr. Graham is entitled to recover from LTD Plan long-term disability benefits under LTD Plan's plan documents from May 29, 2019 to the date of judgment, and prejudgment interest.

37. LTD Plan is obligated to pay Mr. Graham monthly long-term disability benefits for as long as he remains eligible for such benefits under LTD Plan's plan documents

38. Ms. Graham is entitled to recover in the discretion of the Court an award of attorney's fees and costs against defendant pursuant to 29 U.S.C. § § 1132(g).

Prayer for Relief

Wherefore, having complained of LTD Plan, Mr. Graham prays the Court for the following relief:

1. A judgment that LTD Plan is obligated to pay Mr. Graham long-term disability benefits from May 29, 2019, through the date of judgment and prejudgment interest;

2. A judgment that LTD Plan is obligated to pay Mr. Graham monthly long-term disability benefits post-judgment for as long as remains eligible for such benefits under LTD Plan's plan documents;

3. An award of attorney's fees and costs against LTD Plan pursuant to 29 U.S.C. § 1132(g); and

4. Such other relief as the Court deems just and proper.

December 12, 2019
Date

/s/ Andrew Whiteman

Andrew Whiteman
N.C. State Bar Number 9523
Whiteman Law Firm
5400 Glenwood Ave., Suite 225
Raleigh, North Carolina 27612
Tel: (919) 571-8300
Fax: (919) 571-1004
aow@whiteman-law.com